**FILED**

**MAR 3 1 2011**

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| COUNTY OF CHARLES MIX, | * | CIV 10-3012-RAL |
| | * | |
| Plaintiffs, | * | |
| | * | |
| vs. | * | OPINION AND ORDER |
| | * | GRANTING DEFENDANTS' |
| UNITED STATES DEPARTMENT OF | * | MOTION FOR SUMMARY |
| THE INTERIOR, LARRY ECHO | * | JUDGMENT AND |
| HAWK, in his official capacity as | * | DENYING PLAINTIFF'S |
| Assistant Secretary of Indian Affairs, | * | MOTION FOR SUMMARY |
| MICHAEL BLACK, in his official | * | JUDGMENT |
| capacity as Regional Director, Great | * | |
| Plains Region, BEN KITTO, in his | * | |
| official capacity as Superintendent of the | * | |
| Yankton Agency, and YANKTON | * | |
| SIOUX TRIBE, | * | |
| | * | |
| Defendants. | * | |

## I. INTRODUCTION

Plaintiff Charles Mix County ("Plaintiff") filed this action seeking declaratory and

injunctive relief from the Department of the Interior's decision to take 39 acres of land into trust

for the Yankton Sioux Tribe ("Tribe"). Defendants United States Department of the Interior;

Larry Echo-Hawk, Assistant Secretary of Indian Affairs, United States Department of the

Interior; Michael Black, Great Plains Regional Director, Bureau of Indian Affairs ("BIA"); and

Ben Kitto, Yankton Agency Superintendent (collectively "Defendants") moved to dismiss

Plaintiff's claims or, in the alternative, for summary judgment (Doc. 8). Plaintiff then filed a

cross-motion for summary judgment (Doc. 10). For the reasons explained below, this Court

grants Defendants' Motion for Summary Judgment and denies Plaintiff's Motion for Summary

Judgment.

## II. FACTS

### A. Source For Undisputed Facts

This case involves an appeal under the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"). Plaintiff has filed a motion for summary judgment, and Defendants have filed a motion to dismiss or alternatively for summary judgment. Neither Plaintiff nor Defendants contend that there exist any genuine issue of material fact.

Ordinarily, review of administrative decisions focuses upon the administrative record. Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp., 423 U.S. 326, 331 (1976). While courts are obligated to give the administrative record a searching, in-depth review, South Dakota v. U.S. Dep't of Interior, 423 F.3d 790, 799 (8th Cir. 2005), this obligation does not require courts to excuse or remedy a party's failure to comply with the Federal Rules of Civil Procedure. See O'Toole v. Olathe Unified Sch. Dist., 144 F.3d 692, 709 (10th Cir. 1998) (although statute required court to conduct modified de novo review of administrative record, district court properly enforced local rule that required motions for summary judgment to "identify disputed facts and provide citations to the record in support thereof.").

Defendants complied with Local Rule 56.1 by filing a Statement of Undisputed Material Facts (Doc. 8-1) along with their Motion for Summary Judgment. Plaintiff complied with Local Rule 56.1 in form only by filing a two-page document entitled County's Statement of Material Facts (Doc. 12). Defendants responded in compliance with Local Rule 56.1, by filing Defendants' Response to Plaintiff's Statement of Material Facts (Doc. 15), noting, not inappropriately, that ten of the eleven sentences constituting County's Statement of Material Facts were disputed legal conclusions and not factual statements.

By way of illustration, Plaintiff's Statement of Material Facts contains conclusory legal arguments such as "Section 5 of the IRA is unconstitutional" and "[o]ne of the Agency decision makers was biased." (Doc. 12). Of the eleven sentences in Plaintiff's Statement of Material Facts, only five include citations to the record, and those citations generally are to

2

the first page of either a decision by a BIA official or a brief by Plaintiff or the State of South Dakota. Id. Plaintiff's Statement of Material Facts asserts that "[t]he County was denied an opportunity to review evidence and present evidence in response before the Acting Regional Director or the Interior Board of Indian Appeals made the decision." (Doc. 12). Rather then following this statement with citations to documents Plaintiff claims they are missing, Plaintiff cites to the first page of the Superintendent's decision, the first page of the Regional Director's decision, and the first page of the Interior Board of Indian Appeal's decision.

Plaintiff also filed a Brief in Support of County's Motion for Judgment and in Resistance to Federal Defendants' Motion for Summary Judgment and Motion to Dismiss (Doc. 11). That brief was seven pages in length, and outlined Plaintiff's arguments in a very conclusory manner without directing the Court to specific facts to support Plaintiff's assertions. Of course, a party moving for, or opposing, summary judgment must support their assertions by "citing to *particular parts of materials* in the record . . ." Fed. R. Civ. P. 56(c)(1)(a) (emphasis added). Plaintiff has not complied with this requirement.

A Court has no obligation to sift through the administrative record hunting for arguments and evidence to support a party's general assertions. See Rodgers v. City of Des Moines, 435 F.3d 904, 908 (8th Cir. 2006) ("Without some guidance, we will not mine a summary judgment record searching for nuggets of factual dispute to gild a party's arguments."); see also Thomas v. Halter, 131 F. Supp. 2d 942, 945 (E.D.Mich. 2001) ("Plaintiff should not expect the Court to search the ALJ's ruling in support of Plaintiff's argument; i.e., he should not anticipate that the Court will do what he could and should have done for himself."); Nat'l Wildlife Fed'n v. Buford, 677 F. Supp. 1445, 1462 (D.Mont. 1985) (explaining that in case where party challenged decision of Secretary of the Interior under APA, "[t]he Court will not sift through the record and search out [facts supporting the plaintiffs' claims] on the basis of

3

generalized allegations made by plaintiffs that are not supported by references to the record."). Thus, if Plaintiff fails to properly explain a claim and provide adequate citation to support it, this Court will neither make Plaintiff's argument for it nor attempt to guess which portions of the administrative record Plaintiff might be relying on. See Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.") (citing White v. McDonnell Douglas Corp., 904 F.2d 456, 458 (8th Cir. 1990)). Instead, the Court draws the facts from portions of the administrative record to which the parties direct the Court through Defendants' Statement of Undisputed Material Facts (Doc. 8-1) and Plaintiff's Response (Doc. 13), while being mindful of documents referenced generally by Plaintiff.

## B. Facts Not Subject to Genuine Dispute

On March 1, 2004, the Business and Claims Committee ("Committee") of the Yankton Sioux Tribe ("Tribe") enacted a resolution requesting that the BIA accept a 39-acre parcel of land into trust for the Tribe. (Doc. 8-1, Doc. 13). The parcel of land is located in Charles Mix County, is across the road from the Tribe's casino, and is known as the Travel Plaza. (Doc. 8-1, Doc. 13). In its resolution, the Committee stated that it was responsible for providing economic development for the Tribe and its members, that the Tribe currently had a gas station and a convenience store on the Travel Plaza, and that the use of the Travel Plaza would remain the same should the BIA take the property into trust. (Doc. 8-1, Doc. 13).

On March 19, 2004, the BIA Yankton Superintendent ("Superintendent") notified Plaintiff, the State of South Dakota, White Swan Township, and the Wagner Community School District that the BIA had received the Tribe's trust application and was considering it. (Doc. 8-

4

1, Doc. 13; A.R. 2638-50). Plaintiff and the State each provided comments to the Superintendent opposing the trust acquisition. (Doc. 8-1, Doc. 13).

On August 26, 2004, the Superintendent issued a decision letter approving the acceptance of the Travel Plaza parcel into trust for the Tribe. (Doc. 8-1, Doc. 13). Plaintiff and the State appealed the Superintendent's decision to the Regional Director ("RD"). (Doc. 8-1, Doc. 13). The RD affirmed the trust acquisition on May 22, 2007. (Doc. 8-1, Doc. 13). Plaintiff and the State then appealed the matter to the Interior Board of Indian Appeals ("IBIA"). (Doc. 8-1, Doc. 13). On April 30, 2009, the IBIA affirmed the RD's decision. (Doc. 8-1, Doc. 13).

Plaintiff now contends that the trust acquisition was unlawful for a number of reasons. First, Plaintiff challenges the constitutionality of Section 5 of the Indian Reorganization Act ("IRA"), which provides the Secretary of the Interior with the authority to acquire trust land for Indian tribes. Plaintiff claims that Section 5 is an unconstitutional delegation of legislative power, that it operates to deprive Plaintiff of a republican form of government, and that Section 5 violates both the Tenth and Fourteenth Amendments. Second, Plaintiff argues that the Committee exceeded its authority by passing the resolution requesting that the BIA take the Travel Plaza into trust. Third, Plaintiff argues that its due process rights were violated because one of the BIA employees was biased and because Plaintiff was neither allowed to review the evidence put before the decision-maker nor to present evidence in response. Finally, Plaintiff argues that the BIA's decision to take the Travel Plaza into trust was arbitrary and capricious and therefore should be set aside under the Administrative Procedure Act ("APA").

## III. DISCUSSION

### A. Summary Judgment Standard

Both Plaintiff and Defendants have filed motions for summary judgment. Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the

5

movant shows that there is no genuine dispute as to any material fact and the moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In a determination of

whether summary judgment is warranted, the evidence is "viewed in the light most favorable

to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting

Cordry v. Vanderbilt Mortgage & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)). A party

opposing a properly made and supported motion for summary judgment must cite to

particular materials in the record supporting the assertion that a fact is genuinely disputed.

Fed. R. Civ. P. 56(c)(1). "To survive summary judgment, a plaintiff must substantiate his

allegations with enough probative evidence to support a finding in his favor." Adam v.

Stonebridge Life Ins. Co., 612 F.3d 967, 971 (8th Cir. 2010) (quoting Roeben v. BG

Excelsior Ltd. P'ship, 545 F.3d 639, 642 (8th Cir. 2008)). This case involves an appeal under

the APA where no party asserts that there are issues of fact in dispute and where no party has

sought a hearing.

**B. Constitutionality of Section 5 of the IRA**

**1. Non-delegation Challenge**

Section 5 of the IRA provides in pertinent part that:

> The Secretary of the Interior is authorized, in his discretion, to
> acquire, through purchase, relinquishment, gift, exchange, or
> assignment, any interest in lands, water rights, or surface rights to
> lands, within or without existing reservations, including trust or
> otherwise restricted allotments, whether the allottee be living or
> deceased, for the purpose of providing land for Indians.
> ***
> Title to any lands or rights acquired pursuant to this Act . . . shall be
> taken in the name of the United States in trust for the Indian tribe
> or individual Indian for which the land is acquired, and such lands
> or rights shall be exempted from State and local taxation.

25 U.S.C. § 465. Plaintiff claims in Count 1 of its Complaint that Section 5 of the IRA is an

unconstitutional delegation of legislative power because it fails to establish adequate standards

6

by which to guide the BIA's decision concerning the taking of land into trust. (Doc. 1 at ¶ 34).

Plaintiff does not advance this argument in its brief, however. (See Doc. 11). The United States

Court of Appeals for the Eighth Circuit specifically addressed this argument in South Dakota v.

U.S. Dep't of Interior, 423 F.3d 790 (8th Cir. 2005) ("South Dakota II").[1]  In South Dakota II,

the Secretary exercised its authority under Section 5 of the IRA and accepted 91 acres of land

into trust for the Lower Brule Sioux Tribe. Id. at 794. The State and other plaintiffs raised

several arguments in opposition to the Secretary's decision, including a non-delegation

challenge identical to the one Plaintiff makes in the present case.[2]  The Eighth Circuit explained

that "Congress may delegate its legislative power if it lays down by legislative act an intelligible

principle to which the person or body authorized to act is directed to conform." Id. at 795

(citation and internal marks omitted). The South Dakota II Court then rejected the contention

that Section 5 failed to delineate any boundaries governing the Secretary's trust acquisition

decisions, instead finding that:

> [A]n intelligible principle exists in the statutory phrase 'for the
> purpose of providing land for Indians' when it is viewed in the

---

[1] There are four prior published opinions involving taking lands into trust between the State of South Dakota and the United States Department of Interior, to which this Court cites in this Opinion and Order. To avoid confusion, this Court refers to them in chronological sequence as South Dakota I, South Dakota II, South Dakota III and South Dakota IV.

[2] Counties within the State of South Dakota and the State itself have raised this same non-delegation argument in a number of different trust acquisition cases. See South Dakota v. U.S. Dep't of Interior, 314 F. Supp. 2d 935, 949-51 (D.S.D. 2004) ("South Dakota I") (stating that"Congress has clearly delineated the 'boundaries' of the Secretary's authority as bestowed upon him by § 465."); South Dakota v. U.S. Dep't of Interior, 401 F. Supp. 2d 1000, 1005 (D.S.D. 2005) ("South Dakota III") (finding South Dakota II "factually identical and controlling" and holding that Section 5 of the IRA was not an unconstitutional delegation of power); South Dakota v. U.S. Dep't of Interior, 487 F.3d 548, 551 (8th Cir. 2007) ("South Dakota IV") (declining to reconsider its decision in South Dakota II). Indeed, this Court recently rejected an identical non-delegation challenge in South Dakota v. U.S. Dep't of Interior, No. Civ. 10-3007, 2011 WL 382744, at * 3 (D.S.D. Feb. 3, 2011).

> statutory and historical context of the IRA. The statutory aims of
> providing lands sufficient to enable Indians to achieve self-support
> and ameliorating the damage resulting from the prior allotment
> policy sufficiently narrow the discretionary authority granted to the
> Department.

Id. at 799.

Other courts considering non-delegation challenges to Section 5 have reached the same

conclusion. See Mich. Gambling Opposition v. Kempthorne, 525 F.3d 23, 33 (D.C. Cir. 2008)

(agreeing with the First, Eighth, and Tenth Circuits that Section 5 is not an unconstitutional

delegation of legislative authority); Carcieri v. Kempthorne, 497 F.3d 15, 43 (1st Cir. 2007)

("We hold that section 465 is not an unconstitutional delegation of legislative authority.");

United States v. Roberts, 185 F.3d 1125, 1137 (10th Cir. 1999) (rejecting argument that Section

5 unconstitutionally "delegates standardless authority to the Secretary"); Cent. New York Fair

Bus. Ass'n v. Salazar, No. 608-CV-660, 2010 WL 786526, at *4 (N.D.N.Y. Mar. 1, 2010)

("Every court to consider a delegation challenge to § 465 has rejected it and found that agency

regulations sufficiently limit the Secretary of the Interior's discretion.") (citations omitted).

Likewise, this Court concludes that Section 5of the IRA is not an unconstitutional delegation of

legislative authority. Accordingly, summary judgment for Defendants on Count 1 of Plaintiff's

Complaint is proper.

## 2. Tenth Amendment Challenge

Plaintiff contends in Count 2 of its Complaint that Congress lacked authority to enact

Section 5 of the IRA and claims in Count 3 that Section 5 of the IRA violates the Tenth

Amendment to the United States Constitution. (Doc. 1 at ¶¶ 36, 38). Specifically, Plaintiff

claims that the authority to take off-reservation land into trust for Indian tribes was not a power

delegated to Congress by the Constitution, and that the "authority over such lands was reserved

8

to the states by the Tenth Amendment." Id. The Tenth Amendment reserves to the states those powers not delegated to the federal government. See U.S. Const. amend. X.

If the Constitution delegates a power to Congress, however, the "'Tenth Amendment expressly disclaims any reservation of that power to the States.'" United States v. Crawford, 115 F.3d 1397, 1401 (8th Cir. 1997) (quoting New York v. United States, 505 U.S. 144, 156 (1992)). The Indian Commerce Clause provides Congress with the power to "regulate commerce . . . with the Indian tribes." U.S. Const. art. I, § 8, cl. 3. The United States Supreme Court consistently has held that the Indian Commerce Clause grants Congress broad and exclusive authority to legislate in the field of Indian affairs. See United States v. Lara, 541 U.S. 193, 200 (2004) ("[T]he Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as 'plenary and exclusive.'") (citations omitted); Seminole Tribe of Florida v. Florida, 517 U.S. 44, 62 (1996) ("If anything, the Indian Commerce Clause accomplishes a greater transfer of power from the States to the Federal Government than does the Interstate Commerce Clause."); Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 192 (1989) ("[T]he central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs.") (citations omitted); Morton v. Mancari, 417 U.S. 535, 551 (1974). ("With the adoption of the Constitution, Indian relations became the exclusive province of federal law."); Means v. Wilson, 522 F.2d 833, 839 (8th Cir. 1975) ("Under the Indian Commerce Clause, Congress has plenary authority over Indians.") (citing Worcester v. Georgia, 31 U.S. 515, 559 (1832)).

9

Under the Supreme Court's expansive interpretation of the Indian Commerce Clause, Congress has authority to enact Section 5 of the IRA. Because the Secretary's authority to accept land into trust for Indians flows from power delegated to Congress by the Constitution, Section 5 of the IRA does not contravene the Tenth Amendment. See New York, 505 U.S. at 156; see also Carcieri v. Kempthorne, 497 F.3d 15, 39-40 (1st Cir. 2007), rev'd on other grounds ("Because Congress has plenary authority to regulate Indian affairs, section 465 of the IRA does not offend the Tenth Amendment."); Central New York Fair Bus. Ass'n v. Salazar, No. 608-CV-660, 2010 WL 786526 at *4 (N.D.N.Y. Mar. 1, 2010) ("The Tenth Amendment is simply not implicated by the [Department of the Interior's] action under [Section 5] of the IRA because the Secretary's authority to take the land into trust for Indians is derived from powers delegated to Congress in Article I.") (citation omitted). Accordingly, summary judgment for Defendants on Counts 2 and 3 of Plaintiff's Complaint is proper.

### 3. Republican Form of Government Challenge

Plaintiff asserts in Count 4 of its Complaint that Section 5 of the IRA deprives it of a republican form of government because Plaintiff loses jurisdiction and authority over land that the BIA takes into trust for the Tribe. (Doc. 1 at ¶¶ 40-44). Again, Plaintiff makes no arguments in its brief to advance this theory. (See Doc. 11).

Article IV, Section 4 of the United States Constitution contains the "Guarantee Clause," providing that the "United States shall guarantee to every state in this union a republican form of government. . ." U.S. Const. art. IV, § 4. Claims under the Guarantee Clause usually are considered political questions, and courts rarely find them justiciable. See New York v. United

States, 505 U.S. 144, 184 (1992) ("[T]he guarantee clause has been an infrequent basis for litigation throughout our history. In most of the cases in which the Court has been asked to apply the Clause, the Court has found the claims presented to be nonjusticiable under the 'political question' doctrine.") (citations omitted); see also Deer Park Indep. Sch. Dist. v. Harris Cnty. Appraisal Dist., 132 F.3d 1095, 1099 (5th Cir. 1998) ("[T]he Supreme Court has held that challenges to Congressional action under the Guarantee Clause are not justiciable.") (citations omitted); 13C Wright et. al. Federal Practice and Procedure § 3534.1 (3d ed. 2008) ("[I]t has been well established that political questions are presented by challenges to either congressional or state action grounded on the constitutional mandate in Article IV, § 4, that the United States shall guarantee every state a "Republican Form of Government."). Plaintiff's Guarantee Clause challenge to Section 5 of the IRA presents a non-justiciable political question.

Even if Plaintiff's Guarantee Clause claim was justiciable, Section 5 of the IRA does not violate the Guarantee Clause. The Supreme Court defined a Republican Form of Government in Duncan v. McCall, 139 U.S. 449, 461 (1891) as follows:

> [T]he right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves, but while the people are thus the source of political power, their governments, national and state, have been limited by written constitutions, and they have themselves thereby set bounds to their own power, as against the sudden impulses of mere majorities.

Id. The fact that Plaintiff will no longer be able to exercise jurisdiction and authority over the Travel Plaza does not pose a "realistic risk of altering the form or the method of functioning of [Plaintiff's] government." New York, 505 U.S. at 186; see also City of Lincoln v. U.S.

11

Dep't of Interior, 229 F.Supp. 2d 1109, 1117 (D. Or. 2002) (holding that a transfer of tribal

land located within city limits into trust did not violate the Guarantee Clause even though the

transfer allowed tribal members to vote in local elections without being subject to local

regulation or taxation). At most, the BIA's placement of the Travel Plaza into trust merely

reduces the area over which Plaintiff may exercise certain jurisdictional powers of its already

existing republican form of government. Summary judgment for Defendants on Count 4 of

Plaintiff's Complaint is proper.

**4. Fourteenth Amendment Challenge**

Plaintiff contends in Count 5 of its Complaint that Section 5 of the IRA is

unconstitutional under the Fourteenth Amendment because by taking land into trust, the

United States "abridges the privileges and immunities of non-Indians who live on or who

pass through that land." (Doc. 1 at ¶¶ 46-50). Plaintiff also argues that taking land into trust

"denies such citizens equal protection, because they cannot participate in the government of

the area and may be subject to the jurisdiction of a tribal government in which they may not

participate." Id. Yet again, Plaintiff's brief provides no elaboration on this assertion. (Doc.

11).

To begin with, it is questionable that Plaintiff, as a county, has standing to raise this

claim on behalf of its citizens. See State of Iowa ex rel. Miller v. Block, 771 F.2d 347, 354-

355 (8th Cir. 1985) (explaining that while courts have allowed some state *parens patriae*

suits against the federal government in the past, the most "well-reasoned discussions of this

type of suit disallow its use against the federal government . . .") (citing Alfred L. Snapp &

Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 610 n.16 (1982) ("A state does not have

12

standing as *parens patriae* to bring an action against the Federal Government.") (citation omitted)); Erwin Chemerinsky, <u>Federal Jurisdiction</u> 115 (5th ed. 2007) ("One important limit on parens patriae standing of state and local governments is that they may not sue the federal government in this capacity, though they may sue the federal government to protect their own sovereign or proprietary interests.").

Plaintiff's reliance on the Fourteenth Amendment is misplaced. Section 1 of the Fourteenth Amendment provides that "No *State* shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any *State* . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1 (emphasis added). The Fourteenth Amendment, thus "by its very terms" applies only to state, rather than federal, action. <u>United States v. Morrison</u>, 529 U.S. 598, 621 (2000); <u>see also</u> <u>Russell v. Hug</u>, 275 F.3d 812, 822 (9th Cir. 2002) (explaining that the Privileges or Immunities Clause of the Fourteenth Amendment "applies in terms only to actions taken by states, not to those . . . taken by the federal government.").

Even if Plaintiff had properly raised its equal protection argument under the Due Process Clause of the Fifth Amendment, such an argument would be unsuccessful.[3] The exclusion of non-Indians from participation in tribal government does not constitute racial discrimination or the drawing of impermissible classifications. The reason that non-Indians living near the Travel Plaza may not participate in internal tribal affairs is because these non-Indians are not members of the Tribe, a quasi-sovereign political entity. <u>United States v.</u>

---

[3] The principles of equal protection apply to the federal government through the due process clause of the Fifth Amendment, not the Fourteenth Amendment. <u>See</u> <u>Bolling v. Sharpe</u>, 347 U.S. 497 (1954).

Antelope, 430 U.S. 641, 646 (1977) ("federal regulation of Indian affairs is not based upon

impermissible classifications. Rather, such regulation is rooted in the unique status of

Indians as a 'separate people' with their own political institutions . . .") (quoting Morton v.

Mancari, 417 U.S. 535, 553 n.24 (1974)); see also Felix Cohen, Cohen's Handbook of

Federal Indian Law § 14.01[2][b][ii] ("The unique status of Indian tribes under the

Constitution and treaties establishes a legitimate purpose for singling out Indians as a class.").

Accordingly, summary judgment for Defendants on Count 5 is proper.

## 5. The Statutory Aims of Section 5 of the IRA

Plaintiff alleges in Count 6 of its Complaint that accepting the Travel Plaza into trust has

"not been demonstrated to operate sufficiently to enable Indians to achieve self-support nor has

it been demonstrated to operate sufficiently to ameliorate the damage of the allotment policy."

(Doc. 1 at ¶ 52). In discussing Section 5 of the IRA, the Eighth Circuit has noted that "[t]he

statutory aims of providing lands sufficient to enable Indians to achieve self-support and

ameliorating the damage resulting from the prior allotment policy sufficiently narrow the

discretionary authority granted to the Department." South Dakota II, 423 F.3d at 799. This

Court, in South Dakota I, discussed the purposes of the IRA more generally as follows:

> Prior to enactment of the IRA, Congress attempted to assimilate
> Indians into the country's mainstream through an allotment policy.
> General Allotment Act of Feb. 8, 1887, 24 Stat. 388, as amended,
> 25 U.S.C. § 331 et seq. (1976 ed.) (§§ 331-33 repealed 2000). The
> policy of the General Allotment Act was simple: "to extinguish
> tribal sovereignty, erase reservation boundaries, and force the
> assimilation of Indians into the society at large." County of Yakima
> v. Confederated Tribes and Bands of Yakima Indian Nation, 502
> U.S. 251, 254, 112 S.Ct. 683, 686, 116 L.Ed.2d 687 (1992). This
> policy was a failure, which resulted in a loss of more than 90
> million acres of Indian land. Brendale v. Confederated Tribes and
> Bands of Yakima Indian Nation, 492 U.S. 408, 436 n.1, 109 S.Ct.
> 2994, 3011 n.1, 106 L.Ed.2d 343 (1989). As a result, Congress

14

> enacted the IRA in an "attempt to encourage economic
> development, self-determination, cultural plurality, and the revival
> of tribalism." Felix S. Cohen, Handbook of Federal Indian Law
> 147 (1982 ed.). It was also stated that the IRA was designed to
> "rehabilitate the Indian's economic life and to give him a chance to
> develop the initiative destroyed by a century of oppression and
> paternalism." Mescalero Apache Tribe v. Jones, 411 U.S. 145, 152,
> 93 S.Ct. 1267, 1272, 36 L.Ed.2d 114 (1973) (quoting H.R. Rep. No.
> 1804, 73d Cong., 2d Sess., 6 (1934)). In order to stem the
> staggering flow of land from Indian to non-Indian hands, the IRA
> set forth that "no land of any Indian reservation . . . shall be allotted
> in severalty to any Indian." 25 U.S.C. § 461. Congress also tried
> to replenish Indian lands by permitting the Secretary of the Interior
> to acquire land in trust for Indians, noting that land held in trust is
> exempt from local and state taxation. 25 U.S.C. § 465.

South Dakota I, 314 F. Supp. 2d at 950-51.

The record demonstrates that the RD adequately detailed the self-support and economic benefits the Tribe would gain from taking the Travel Plaza into trust. First, the RD explained how the trust acquisition would benefit the Tribe's economy by providing employment for tribal members. (A.R. 1669). Next, the RD explained that bringing the Travel Plaza into trust would help meet the demands of an increase in tribal population. Id.; see South Dakota IV, 487 F.3d at 552 ("Taking additional land into trust to accommodate increased tribal membership is consistent with the statutory aim of enabling Indians to achieve self-support."). Finally, the RD stated that: [w]ithout having to pay yearly taxes, the Tribe can still serve the public's needs with the convenience store and supplement the saved money towards other operating costs incurred by the Tribe. This saved money can be redirected towards program funding to meet other needs of the Tribe." (A.R. 1673).

The BIA's acceptance of the Travel Plaza into trust meets the statutory aims of Section 5 of the IRA. See South Dakota IV, 487 F.3d at 548 (finding that the BIA acted within statutory authority of Section 5 where director found that the tribe needed the land taken into trust to accommodate increased tribal membership and that the tribe's economy would benefit from the

15

acquisition). Summary judgment for Defendants on Count 6 of the Complaint is therefore proper.

**C. Committee's Authority to Request that Land be Placed in Trust**

Plaintiff in Count 7 of its Complaint and in its brief argues that the BIA lacked jurisdiction to consider the Tribe's trust application because the application came in the form of a resolution passed by the Committee. (Doc. 1 at ¶¶ 54-55). In Plaintiff's view, the Committee "lacked the authority as a matter of tribal law to enact the Resolution." (Doc. 1 at ¶ 54).

Article IV, Section 1 of the Tribe's Amended Bylaws states that:

> [t]he Committee shall have the authority to investigate and transact all Tribal business of a routine nature and Indian legislation, including Industry, Sanitation, Housing, Redevelopment and etc., and shall also act in the capacity of a liaison delegation between the Tribe and Federal, State and local governments, and such other agencies or parties that may offer opportunities for the Tribe.

See http://www.sdtribalrelations.com/files/yanktoncon.pdf. (last visited March 11, 2011) (containing Tribe's Constitution and Amended Bylaws). Plaintiff contends that the Committee's enactment of the resolution was not a matter of "routine nature" and that the Committee therefore exceeded their authority under tribal law. Whether Plaintiff's interpretation of tribal law is correct, however, is a question for the Tribe and not for this Court to resolve. See In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litig., 340 F.3d 749, 763-64 (8th Cir. 2003) ("Jurisdiction to resolve internal tribal disputes, interpret tribal constitutions and laws, and issue tribal membership determinations lies with Indian tribes and not in the district courts."); Runs After v. United States, 766 F.2d 347, 352 (8th Cir. 1985) (holding that the district court lacked jurisdiction to resolve "disputes involving questions of interpretation of the tribal constitution and tribal law.").

Section 151.9, the regulation concerning requests for approval of trust applications, states that a trust application "need not be in any special form but shall set out the identity of the parties, a description of the land to be acquired, and other information which would show that the acquisition comes within the terms of this part." 25 C.F.R. § 151.9. The regulation contains no mention of any requirement that the Tribe in a Tribal Council of all members, as opposed to the Committee, be the entity requesting that land be taken into trust. In addition, it is questionable whether Plaintiff has standing to assert that the Committee exceeded the authority granted to it by the Tribal Constitution. See Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) (listing requirements of standing). Accordingly, summary judgment for Defendants on Count 7 of Plaintiff's Complaint is proper.

**D. Due Process Claims**

**1. Plaintiff's Opportunity to Review Evidence Put Before the Decision-Maker**

In Count 8 of its Complaint, Plaintiff alleges that its Due Process Clause Rights were violated because it did not have an opportunity to "review the evidence put before the decision maker regarding the application and to present evidence in response," and that "Plaintiff was not allowed this opportunity before the Regional Director or the IBIA." (Doc. 1 at ¶¶ 59-60). Of course, when opposing a summary judgment motion, a party cannot rest on the allegation of its complaint, but most come forward with evidence. See Thomas v. Hungerford, 23 F.3d 1450, 1454 (8th Cir. 1994) ("A plaintiff opposing a properly supported summary judgment motion may not rest upon the allegations in his complaint.") (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). Plaintiff has failed to do so.

In Plaintiff's Statement of Material Facts, the only fact advanced on this claim is this conclusory statement:

17

> The County was denied an opportunity to review evidence and
> present evidence in response before the Acting Regional Director
> or the Interior Board of Indian Appeals made the decision.
> AR002431, AR001668, AR001324.

(Doc. 12 at ¶ 3). Defendants contested this assertion. (Doc. 15). The pages referenced by

Plaintiff in the administrative record are the first page of the Superintendent's decision, the first

page of the RD's decision, and the first page of the IBIA's decision. In Plaintiff's response to

Defendants' Statement of Undisputed Material Facts, Plaintiff denies having received the entire

administrative record in a timely fashion, but admits receiving a copy of the entire

administrative record upon filing notice of appeal from the RD's decision. (Doc. 13 at ¶ 17).

The entirety of Plaintiff's argument in its brief on this point is the following:

> The County maintains that it did not have an opportunity to review
> the evidence put before the decision maker regarding the
> application and to present evidence in response. Complaint, Dkt.
> No. 1, § 59. The reliance of the United States upon the fact that the
> County participated in every level of the administrative process is
> probative of nothing.

(Doc. 11 at 5). Plaintiff then argues about the bias of Defendants, an argument addressed in the

next section of this Opinion and Order.

In short, Plaintiff's Statement of Material Facts contains no information to support

Plaintiff's contention that it was denied due process. Nor does Plaintiff's brief explain what

documents it allegedly was denied access to. Plaintiff also has failed to identify the arguments it

would have made if Plaintiff had access to the documents Plaintiff claims it was unable to

review. Even if this Court were to assume that the BIA erred by failing to provide Plaintiff with

access to some of the documents that the BIA relied on in deciding to accept the Travel Plaza

into trust, reversal of the BIA's decision would not necessarily be justified.

When reviewing an administrative decision under the APA, courts must take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706; All Indian Pueblo Council v. United States, 975 F.2d 1437, 1443 (10th Cir. 1992); Jicarilla Apache Nation v. U.S. Dep't of Interior, 613 F.3d 1112, 1121 (D.C. Cir. 2010). "The burden to demonstrate prejudicial error is on the party challenging the agency action." Jicarilla, 613 F.3d at 1121; see Shinseki v. Sanders, 129 S.Ct. 1696, 1706 (2009) ("the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."). In the present case, Plaintiff has failed to demonstrate that it was harmed by not having access to the complete administrative record because Plaintiff has neither identified what documents it was missing, nor explained how Plaintiff would have responded to these documents had Plaintiff been given the opportunity to do so. See Owner-Operator Independent Drivers Ass'n, Inc., v. FMCSA, 494 F.3d 188, 202 (D.C. Cir. 2007) (to show that it was harmed by an administrative agency's failure to disclose certain documents during a notice-and-comment period, a party must "indicate with reasonable specificity what portions of the documents it objects to and how it might have responded if given the opportunity" and show "that on remand [the party] can mount a credible challenge" to the agency's reliance on the supporting documents) (internal marks and citations omitted); Omnipoint Corp. v. F.C.C., 78 F.3d 620, 630 (D.C. Cir. 1996) (shortened notice-and-comment period in administrative rulemaking context was harmless where party "failed to identify any substantive challenges it would have made had it been given additional time" to comment on the rule); Parchman v. U.S. Dep't of Agric., 852 F.2d 858, 865-66 (6th Cir. 1988) (ALJ's refusal to admit arguably irrelevant evidence did not violate plaintiff's due process rights where plaintiffs failed to show prejudice

19

from not having evidence admitted); see also Craig Smith, Taking "Due Account" of the
APA's Prejudicial-Error Rule, 96 Va. L. Rev. 1727, 1746-47 (2010). Plaintiff has failed to
come forward with evidence or argument from which this Court could consider whether, if
there was a due process violation, something more than harmless error resulted. See
Shinseki, 129 S.Ct. at 1707 (explaining that a reviewing court's harmless error determination
potentially involves "an estimation of the likelihood that the result would have been
different."); Jicarilla, 613 F.3d at 1121 ("The harmless error rule applies to agency action
because if the agency's mistake did not affect the outcome, if it did not prejudice the
petitioner, it would be senseless to vacate and remand for reconsideration.") (citation and
internal marks omitted). Accordingly, summary judgment for Defendants on Count 8 of
Plaintiff's Complaint is proper.

### 2. Claim of Bias on the Part of Regional Director William Benjamin

Plaintiff claims in Count 9 of its Complaint that its due process right to a neutral
decision-maker was violated because of bias on the part of BIA employees. (Doc. 1 at ¶¶ 62-
64). Plaintiff mentions this claim in its brief as well. (See Doc. 11 at 5).

A fair and unbiased tribunal is a fundamental requirement of the Due Process Clause.
See In re Murchison, 349 U.S. 133, 136 (1955) ("a fair trial in a fair tribunal is a basic
requirement of due process."); Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980) ("The Due
Process Clause entitles a person to an impartial and disinterested tribunal in both civil and
criminal cases."). This requirement applies to courts and administrative agencies alike. See
Withrow v Larkin, 421 U.S. 35, 46-47 (1975) (noting that the fair tribunal requirement of due
process "applies to administrative agencies which adjudicate as well as to courts."); Deretich v.

20

Office of Admin. Hearings, State of Minn., 798 F.2d 1147, 1152 (8th Cir. 1986) ("[A] hearing

officer must be impartial for an administrative agency to meet the requirements of due

process.") (citations omitted); see also South Dakota III, 401 F. Supp. 2d at 1011 ("The

Department of Interior's review of an application to take land into trust is subject to the due

process clause and must be unbiased.") (citations omitted).

However, "[i]t requires a substantial showing of bias to disqualify a hearing officer in

administrative proceedings or to justify a ruling that the hearing was unfair." United States ex

rel. De Luca v. O'Rourke, 213 F.2d 759, 765 (8th Cir. 1954). A party claiming bias on the part

of an administrative tribunal must overcome "a presumption of honesty and integrity in those

serving as adjudicators." In re Morgan, 573 F.3d 615, 624 (8th Cir. 2009) (quoting Withrow,

421 U.S. at 47.). "Plaintiffs bear the heavy burden of establishing that the administrative

hearing was unfair." South Dakota III, 401 F.Supp. 2d at 1011 (citing Cent. Ark. Auction Sale,

Inc. v. Bergland, 570 F.2d 724, 731 (8th Cir. 1978)).

Plaintiff's bias argument appears to be based on a letter from the Chairman of the

Committee to RD William Benjamin. The letter states in pertinent part:

> As you know one of our major concerns is the Fee to Trust of the
> Wagner Heights Addition and the Yankton Sioux Tribal Travel
> Plaza. This action is almost a decade old and I know that you made
> a commitment to the past Yankton Sioux Tribal Council to
> champion this cause on our behalf. Needless to say we hope and
> are counting on you to continue to honor that promise to this year's
> new council as well.

(A.R. 1876). Although the BIA employee who actually issued the decision letter accepting the

Travel Plaza into trust was Acting RD Roy A. Pulfrey (A.R. 1678), Plaintiff alleges that RD

Benjamin was "actively involved in the seeking of evidence favoring the grant of the application

to take land into trust." (Doc. 1 at ¶ 62). Plaintiff also asserts that when the Acting RD

21

approved the Travel Plaza trust acquisition he did so at the behest of RD Benjamin, and breached the Acting RD's obligation to act as a neutral decision-maker by honoring or appearing to honor RD Benjamin's commitment to the Tribe's cause. Id. at ¶ 64. Plaintiff fails to offer any evidence to support these theories, however, and unsubstantiated claims of bias generally are not enough to overcome the presumption of impartiality in an administrative decision-maker. See Bauer v. Soc. Sec. Admin., 734 F. Supp. 2d 773 (D. Minn. 2010) (plaintiff's reliance on "rumor and subjective impression" to prove that ALJ was biased was not enough to overcome the presumption of impartiality). Even if RD Benjamin were somehow involved in the trust acquisition of the Travel Plaza, the Chairman's letter does not establish that RD Benjamin was biased against Plaintiff. Instead, the letter contains only the Chairman's assertion that Mr. Benjamin had made a "commitment" to the Tribe concerning the trust acquisition of the Travel Plaza.

At bottom, Plaintiff's claims of bias neither amount to a "substantial showing of bias" nor overcome the "presumption of honesty and integrity in those serving as adjudicators." See South Dakota v. Dep't of Interior, No. Civ. 10-3007, 2011 WL 382744 at *5-6 (D.S.D. Feb. 3, 2011) (rejecting the plaintiffs' claims that BIA decision-maker was biased). Accordingly, summary judgment in favor of Defendants on Count 9 of Plaintiff's Complaint is proper.

**E. Application of Department of Interior Regulations**

Plaintiff in Counts 10 and 11 claims that the BIA's decision to take the Travel Plaza land into trust was arbitrary and capricious and thus in violation of the APA. Although review of agency action under the APA must be "searching and careful," a court may only set aside decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

22

accordance with the law." <u>Thomas v. Jackson</u>, 581 F.3d 658, 664 (8th Cir. 2009). Agency action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decisions that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

<u>In re Operation of Mo. River Sys. Litig.</u>, 421 F.3d 618, 628 (8th Cir. 2005) (citations omitted). This Court affords "substantial deference to an agency's interpretation of its own regulation . . ." <u>South Dakota IV</u>, 487 F.3d at 551. Furthermore, this Court will uphold the BIA's decision to take the Travel Plaza into trust if it is "supportable on any rational basis." <u>Voyageurs Nat'l Park Ass'n v. Norton</u>, 381 F.3d 759, 763 (8th Cir. 2004) (citation omitted).

Plaintiff now contends that the BIA's decisions were arbitrary and capricious because the BIA failed to adequately analyze the factors set out at 25 C.F.R. Part 151. <u>See</u> 25 C.F.R. Part 151 (laying out the factors the Secretary is required to consider when deciding whether to take land into trust for a tribe). Specifically, in its brief, Plaintiff takes issue with: 1) the BIA's analysis of the Tribe's need for the land under 25 C.F.R. § 151.10(b); and 2) the BIA's consideration of the impact on local governments from removing the Travel Plaza from the tax base under 25 C.F.R. § 151.10(e) (Doc. 11 at 5-6). The Complaint also challenged: 3) the BIA's analysis of potential jurisdictional problems under 25 C.F.R. § 151.10(f); 4) the BIA's determination that it was able to assume responsibility for the Travel Plaza parcel of land under 25 C.F.R. § 151.10(g); and 5) the BIA's determination regarding environmental matters under 25 C.F.R. § 151.10(h). Plaintiff bears the burden of proving that the BIA's analysis of these factors was arbitrary and capricious. <u>South Dakota II</u>, 423 F.3d at 800 (citation omitted). To meet this burden of proof, Plaintiff must "[p]resent evidence that the [BIA] did not consider a

particular factor; it may not simply point to the end result and argue generally that it is incorrect." Id.

### 1. The Tribe's Need For the Land

Section 151.10(b) requires the BIA to consider the "need of the . . . tribe for additional land." 25 C.F.R. § 151.10(b). Plaintiff argues that the Tribe failed to meet the requirements of Section 151.10(b) because the Tribe did not "demonstrate why trust status was needed." (Doc. 1 at ¶ 23). However, Section 151.10(b) does not require the BIA to consider why the Tribe needs the land held *in trust.* South Dakota II, 423 F.3d at 801 ("[I]t would be an unreasonable interpretation of 25 C.F.R. § 151.10(b) to require the Secretary to detail specifically why trust status is more beneficial than fee status in the particular circumstance.") (citing South Dakota I, 314 F. Supp. 2d at 943). Rather, Section 151.10(b) requires only that the BIA's "analysis express the Tribe's needs and conclude generally that IRA purposes were served." Id.; see also South Dakota I, 314 F. Supp. 2d at 943 ("Regulation § 151.10(b) requires that the Secretary must merely explain why the Tribe needs the additional land.").

In the present case, the RD adequately addressed the Tribe's need for the Travel Plaza land. The RD found that accepting the land into trust would "help the Tribe to maintain economic growth on the reservation by providing job opportunities to both tribal members and non-tribal members, as well as providing a service to the public." (A.R. 1669). The RD stressed the importance of economic development in Indian country, noted that the acquisition would aid in the Tribe's land consolidation efforts, and explained that accepting the land into trust "may qualify the Tribe for additional federal funding for important social or economic programs or benefits that may not be available to the Tribe if the land is in fee status." Id. The RD also explained that the tribal population had increased 15 percent over the past 10 years

24

without any corresponding increase in trust lands. Id. In its Complaint, Plaintiff objects to the RD's reliance on the increase in tribal population, calling it "irrelevant." Plaintiff fails to explain why the increase in tribal population is irrelevant, however. Indeed, Plaintiff's brief contains the somewhat contradictory statement that the administrative record confirms that the BIA "did consider the relevant statements of total tribal population." (Doc. 11 at 6). In any event, the RD's reliance on the increase in tribal population does not render his decision under Section 151.10(b) arbitrary and capricious. The RD's discussion of the trust acquisition's benefit to the Tribe's economy and land consolidation efforts shows that the RD satisfactorily expressed both the Tribe's need for the land and concluded that the purposes of the IRA were served. See Felix Cohen, Cohen's Handbook of Federal Indian Law § 1.05 at 86 (5th ed. 2005) (The IRA was meant "to encourage economic development, self-determination, cultural pluralism, and the revival of tribalism.").

## 2. Removal of the Travel Plaza From the Tax Rolls

Section 151.10(e) requires the BIA to consider "the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls." 25 C.F.R. § 151.10(e). In his decision letter, the RD explained that Charles Mix County would lose $6,260.10 in annual property taxes if the BIA accepted the Travel Plaza into trust. (A.R. 1670). The RD then explained that the removal of the Travel Plaza from the tax rolls would be offset by the County no longer having to provide certain services to the Travel Plaza once the property was in trust. Id. The RD also found that the County's loss of $6,260.10 was insignificant when compared to the County's $2,744,755.00 total annual tax budget. (A.R. 1671). Plaintiff contends that this analysis was insufficient because the RD "drastically

25

underestimated the percentage decrease in the revenues to the county . . . and failed to include a cumulative analysis of tax loss from all land in tax free trust status." (Doc. 1 at 5-6). However, the text of Section 151.10(e) contains no requirement that the BIA consider such a hypothetical "cumulative analysis." South Dakota III, 401 F. Supp. 2d at 1008 (rejecting the State of South Dakota's argument that 25 C.F.R. § 151.10(e) required consideration of the cumulative effect of all trust land on the tax rolls); see also Shawano Cnty., Wis. v. Midwest Reg'l Dir., 40 IBIA 241, 249 (2005) (explaining that the plain language of Section 151.10(e) establishes that analysis of the cumulative effects of tax loss on all lands within a party's jurisdictional boundaries is unnecessary); Ziebach Cnty., S.D. v. Acting Great Plains Reg'l Dir., 38 IBIA 227, 230 (2002) ("[A]n analysis of cumulative impact is not required by the language of 25 C.F.R. § 151.10(e).") (citations omitted). Because the IBIA's interpretation of Section 151.10(e) is not "plainly erroneous or inconsistent with the regulation," it is entitled to "substantial deference." See South Dakota IV, 487 F.3d at 551. The RD was only required to consider the impact of removing the Travel Plaza from the tax rolls, and the RD's analysis of 151.10(e) was sufficient and supported by a rational basis.

**3. The BIA's Consideration of Potential Jurisdictional Problems**

Section 151.10(f) requires the BIA to consider "[j]urisdictional problems and potential conflicts of land use which may arise" as a result of the BIA's taking land into trust for a tribe. 25 C.F.R. 151.10(f). Plaintiff alleged that the RD "mischaracterized the jurisdictional disputes at issue, misstated the relevant law . . . and failed to adequately consider the political, social and economic effect on the County" of the acceptance of the Travel Plaza into trust. (Doc. 1 at ¶ 25).

The BIA fulfills its obligation under Section 151.10(f) as long as it "undertake[s] an evaluation of potential problems." <u>South Dakota I</u>, 314 F. Supp. 2d at 945 (quoting <u>Lincoln City</u>, 229 F. Supp. 2d at 1124). The RD undertook such an evaluation here. In his decision letter, the RD stated that the "County, City, and Tribe must already work together on agreements to function jointly on the reservation, with scattered trust lands. This requirement is there now, and will not change with this land going into trust status. Therefore, the jurisdictional issues will not increase." (A.R. 1674). The RD further stated that he saw no potential conflicts in land use, because "[t]he land will continue to be used as a convenience store and/or business site by the Tribe." (A.R. 1671). Thus, the RD properly considered Section 151.10(f) and there exists a rational basis for the RD's decision.

### 4. The BIA's Ability to Assume Responsibility for the Travel Plaza

Plaintiff also contests the BIA's findings under 25 C.F.R. § 151.10(g). (Doc. 1 at ¶ 26). Section 151.10(g) requires the BIA to consider "whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status." 25 C.F.R. § 151.10(g). Plaintiff alleged that the RD's analysis under Section 151.10(g) "failed to adequately consider the history of BIA's failures in discharging its responsibilities . . ." (Doc. 1 at ¶ 26). In his consideration of Section 151.10(g), the RD noted that the BIA already provided administrative services on trust land in Charles Mix County, and that the acceptance of 39 more acres into trust would have a minimal impact on the BIA's ability to discharge its responsibilities. (A.R. 1671). The RD explained that the Travel Plaza is located within a 10-minute response time of both the BIA's Law Enforcement Services headquarters and the Indian Health Service hospital, and that the BIA police staff

27

regularly patrol the Travel Plaza area. (A.R. 1672). The RD further noted that the BIA had

cost reimbursement agreements with the Wagner/Lake Andes Ambulance Service and the

Wagner Fire Department whereby these agencies would provide ambulance services and fire

protection to the Travel Plaza area. Id. Lastly, the RD responded to Plaintiff's contention

that the case of Cobell v. Kempthorne, 569 F. Supp. 2d 223 (D.D.C. Cir. 2008) and a 2002

report from the Office of the Inspector General showed that the BIA was not equipped to

manage the Travel Plaza. The RD rejected Plaintiff's contention, explaining that:

> [T]he Cobell lawsuit deals with managing trust accounts and trust
> money. With this specific property, the Tribe will manage their
> business affairs and all their income. In addition, the Inspector
> General's report does not reflect the specific Yankton reservation
> issues with Law Enforcement but is rather a nationwide report."

(A.R. 1674). This Court thus finds that the RD had a rational basis for his determination under

Section 151.10(g), and that he adequately considered Plaintiff's argument.

Plaintiff's challenges to the BIA's analysis of the Part 151 factors ultimately fail because

they do not support a conclusion that the analysis was arbitrary or capricious or otherwise

contrary to law. See Cent. S.D. Co-op Grazing Dist. v. Secretary of U.S. Dep't of Agric., 266

F.3d 889, 898 (8th Cir. 2001) ("[A] party's mere dissatisfaction with [an agency's] decision does

not entitle it to relief.") (citation omitted). Further, Plaintiff has failed to put forth any evidence

that the BIA did not actually consider a factor, which Plaintiff must do if it wishes to meet its

burden of proof. South Dakota II, 423 F.3d at 800 ("In order to meet [their] burden of proof . . .

[plaintiff] must present evidence that the agency did not consider a particular factor; it may not

simply point to the end result and argue generally that it is incorrect."). The BIA's analysis of

the Part 151 factors was not arbitrary, capricious, or an abuse of discretion.

28

**5. The BIA's Consideration of Environmental Matters**

Plaintiff alleges that the RD based his decision under Section 151.10(h) on "evidence not supplied to the opponents of the application." (Doc. 1 at ¶ 27). This Court in a previous section addressed Plaintiff's failure to come forward with information and argument to support an alleged violation of due process. Plaintiff does not allege that the requirements of Section 151.10(h) were not met. Section 151.10(h) requires the BIA to consider the "extent to which the applicant had provided information that allows the Secretary to comply with [the National Environmental Policy Act]. 25 C.F.R. § 151.10(h). "The overriding purpose of NEPA is to prevent or eliminate damage to the environment." Rosebud Sioux Tribe v. McDivitt, 286 F.3d 1031, 1038 (8th Cir. 2002). NEPA requires an agency to "take a hard look at the environmental consequences of an action before issuing its approval." Mo. Coal. for Env't v. F.E.R.C., 544 F.3d 955, 958 (8th Cir. 2008) (internal marks and citation omitted). Here, the RD explained that the NEPA requirement was satisfied because both an Environmental Site Assessment and a Categorical Exclusion document were prepared. (A.R. 1672).

## IV. CONCLUSION

For the reasons explained above, it is

ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 10) is denied. It is further

ORDERED that Defendants' Motion for Summary Judgment (Doc. 8) is granted.

Dated March 31, 2011.

BY THE COURT:

_____
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

29